# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br><br>vs.<br><br>ALISSA LYNN KUCKO and<br>ABYEHUN TEFERI,<br><br>　　　　　　Defendants. | Case No. 21-cr-2068-CJW<br><br>**REPORT AND RECOMMENDATION<br>ON DEFENDANTS' MOTION TO<br>SUPPRESS** |

———————————

## I.    INTRODUCTION

On September 21, 2021, the Grand Jury charged Defendant Alissa Lynn Kucko[1] with one count of False Statement During Purchase of a Firearm in violation of 18 U.S.C. Sections 922(a)(6) and 924(a)(2) and one count of Possession of a Firearm by an Unlawful User of a Controlled Substance in violation of 18 U.S.C. Sections 922(g)(3) and 924(a)(2).  (Doc. 3 at 1-2.)  The Grand Jury charged Defendant Abyehun Teferi with one count of Possession of a Firearm by an Unlawful User of a Controlled Substance in violation of 18 U.S.C. Sections 922(g)(3) and 924(a)(2).  (*Id.* at 2-3.)

The matter before the Court is Defendants' Joint Motion to Suppress Search Warrant and Request for *Franks*[2] Hearing.  (Doc. 27.)  The Government timely filed a response.  (Doc. 31.)  The Honorable Charles J. Williams, United States District Court

---

[1] Ms. Kucko and Mr. Teferi were married shortly before the indictment was filed in this case. Ms. Kucko prefers to be addressed as "Ms. Teferi."  However, as I said at the hearing, the docket in this case still refers to her as "Ms. Kucko," and for consistency, I shall continue to do so.
[2] *Franks v. Delaware*, 438 U.S. 154 (1978).

Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Tuesday, November 2, 2021. (Doc. 38.)

Defendants filed an Inventory of Items to be Suppressed. (Doc. 28.) At the hearing, Defendants' exhibits were admitted without objection:

1. Search warrant (Def. Ex. A);

2. Fleet Farm Surveillance Camera Video (Def. Ex. B); and

3. Fleet Farm Loss Prevention Incident Report (Def. Ex. C).

Although the Government filed exhibits with its Resistance, it did not ask to have them admitted into evidence. The day before the hearing I sent the parties the following email that I read into the record at the hearing:

> In preparation for the hearing tomorrow I have studied the videos closely. I think the [Fleet Farm surveillance] videos are ambiguous.[3] There is no point where I can say for certain Defendant Teferi shows a firearm to the sales clerk. On the other hand, there are several points where Defendant Teferi could be showing a firearm, but the video does not show it. I realize there are other arguments Defendants make regarding *Franks*, but this seems close to the heart of the matter.

> I'm giving you a preview of my thinking to prepare for the hearing tomorrow. I think we should start with argument about *Franks*. You may want to call my attention to something specific in the videos that may be persuasive. At this point, I'm inclined to rule that Defendants have not made a substantial preliminary showing. If, I'm persuaded there is a substantial preliminary showing, then we will proceed to the *Franks* hearing.

The parties then presented oral arguments regarding a *Franks* hearing. I ruled at the hearing that Defendants had not made a substantial preliminary showing they were entitled to a *Franks* hearing. This Report and Recommendation memorializes my reasons

---

[3] As will be discussed in detail below, Defendants contend that the surveillance video of their interactions with firearms salesclerks at a Fleet Farm store show that the warrant application at issue contained false information or material omissions that rendered it misleading.

for denying Defendants' motion. Defendants confirmed this was their only basis for challenging the search warrant. For the following reasons, I respectfully recommend that the District Court **deny** Defendants' Joint Motion to Suppress.

## II. FINDINGS OF FACT

The following facts are taken from the affidavit in support of the search warrant at issue in this case, unless otherwise noted. ATF Task Force Officer Joseph C. Saunders, who is also an officer with the Waterloo, Iowa Police Department, applied for the warrant and submitted the affidavit in support of the application. (Def. Ex. A.) The application was sworn to before me and I issued the warrant. (*Id.* at 1, 16.) Officer Saunders has an associate degree in police science and is a graduate of the Iowa Law Enforcement Academy. (*Id.* at 3.) He has worked in law enforcement since 1989. (*Id.*) Officer Saunders attested that a Fleet Farm employee identified as "Employee-1" contacted the Waterloo Police Detective Bureau on August 9, 2021 and provided the following information. (*Id.* ¶ 8.)[4]

### A. Events of July 2 and July 19, 2021

On July 2, 20201, Defendants went to the firearms department of a Fleet Farm store where Mr. Teferi, who was accompanied by Ms. Kucko, attempted to purchase a Stoeger Model STR-9, 9mm semi-auto pistol bearing serial number T6429-21W06241. (*Id.*) Mr. Teferi was unable to purchase the pistol due to the results of an NICS background check. (*Id.*)

On July 19, 2021, Ms. Kucko returned to Fleet Farm and purchased a Stoeger Model STR-9, 9mm semi-auto pistol bearing serial number T6249-21T00104 ("the

---

[4] Information contained in the affidavit and pertaining to events occurring at Fleet Farm on July 2, 19, and 27, 2021 was provided to the Police Department by Employee-1 unless otherwise noted.

Stoeger") from Employee-3. (*Id.* ¶¶ 10, 14.) Ms. Kucko knew what firearm she wanted without receiving any assistance. (*Id.* ¶ 10.)

**B.    *Events of July 27, 2021***

On July 27, 2021, Defendants entered Fleet Farm together. (*Id.* ¶ 11.) Officer Saunders's affidavit states, "Employee-1 observed that TEFERI had the firearm that Kucko purchased in his possession." (*Id.*)[5] Mr. Teferi was looking for a holster to fit "his" firearm, which, according to Employee-2, who assisted Mr. Teferi that day, he identified as a Stoeger, matching a brand of firearm they sell at Fleet Farm. (*Id.* ¶ 12.) Employee-1 and Employee-2 stated that Mr. Teferi referred to the gun as "my gun," "his gun," and "his firearm."[6] (*Id.* ¶¶ 11-13.) Employee-2 then realized who Mr. Teferi was and recognized Ms. Kucko as the same person who purchased the Stoeger Mr. Teferi was carrying. (*Id.* ¶ 12.)

After recognizing Mr. Teferi, Employee-2 asked him questions, including whether Mr. Teferi had ever shot the firearm or if he had taken it apart. (*Id.* ¶ 13.) Mr. Teferi answered that he loved the gun and that it "shot great." (*Id.*) Employee-2 assisted Mr. Teferi to select a holster and gave him one of the store display Stoeger firearms to check the gun's fit in the holster. (*Id.* ¶ 11.) Mr. Teferi tried the holster on before he purchased it while Ms. Kucko assisted him and stepped back to assess how the holster looked on Mr. Teferi. (Def. Ex. B at 6:00-6:30.) At one point, Mr. Teferi handed the holster to

---

[5] It is disputed whether, in fact, Mr. Teferi actually displayed the firearm to the employee. I need not find (and cannot independently determine from the video evidence) whether Mr. Teferi actually displayed the firearm. Nevertheless, there is no reason to doubt that Officer Saunders accurately reported what he was told by Employee-1. As discussed more particularly below, it is ultimately immaterial whether Mr. Teferi actually possessed the firearm in the store on July 27 and/or displayed it to the employee.

[6] In the context of the affidavit, it is reasonably clear that these references to "my" and "his" all refer to Mr. Teferi.

4

Ms. Kucko, who appeared to inspect the holster and perhaps hold it to her side.[7]  (*Id.* at 5:41.)

**C.    *Events of August 7, 2021***

On August 7, 2021, Employee-3 was restocking Fleet Farm's ammunition aisle when Defendants approached him and asked to purchase .22 ammunition.  (Def. Ex. A ¶ 14.)  This request caught Employee-3 off guard because he knew Ms. Kucko had recently purchased the 9mm Stoeger.  (*Id.*)  During his conversation with Defendants, Mr. Teferi asked Employee-3 about 9mm hollow points for "his gun."  (*Id.*)  Mr. Teferi purchased two boxes of Full Metal Jacket ammunition and one box of hollow point ammunition for "his 9mm."  (*Id.*)

**D.    *Additional Information Based on Officer Saunders's Investigation***

On December 17, 2019, Ms. Kucko applied for a new Iowa permit to carry weapons through the Blackhawk County Sheriff's Office.  (*Id.* ¶ 7.)  She received her permit on January 3, 2020.  (*Id.*)  Notes associated with her application state that Ms. Kucko had no criminal record and no previous firearms permits.  (*Id.*)

Ms. Kucko purchased a Ruger 9mm semi-automatic pistol from Scheels in February 2020.  (*Id.* ¶ 21.)  Ms. Kucko also purchased a Canik/Century Arms 9mm semi-automatic pistol and a German Sport Guns .22 caliber rifle from Mr. Guns in July 2021.  (*Id.* ¶ 19.)  The owner of Mr. Guns stated that whenever Ms. Kucko was purchasing firearms, she was accompanied by "a tall, thin, light-skinned black male." (*Id.* ¶ 20.)  Officer Saunders noted this description matches Mr. Teferi's general characteristics.  (*Id.*)

---

[7] Def. Ex. B is surveillance video from Fleet Farm and is very clear.  However, important details of the interactions are often obstructed.  Mr. Teferi is mostly covered by a display of fishing rods and, while Ms. Kucko is more visible, she has her back to the camera much of the time.

On June 22, 2021, Mr. Teferi pleaded guilty to Assault Causing Bodily Injury and received a deferred judgment with one year of probation. (*Id.* ¶ 17.) Ms. Kucko was the victim in that case. (*Id.*) On the date of the assault in March 2020, Ms. Kucko told a Waterloo police officer that she and Mr. Teferi had been together four years. (*Id.*) Mr. Teferi said Ms. Kucko was his girlfriend and they had been living together for two years. (*Id.*) Officers on the scene seized Ms. Kucko's Ruger handgun and Mr. Teferi's Taurus handgun. (*Id.* ¶ 22.) Ms. Kucko's Ruger was returned to her on August 13, 2020 and Mr. Teferi's Taurus was returned to him on July 22, 2021. (*Id.*) Both Defendants list the same address, [XXXX] Ackermant Street, Waterloo, Iowa, in IDOT records. (*Id.* ¶ 24.)

Based on, *inter alia*, the above information, Officer Saunders suspected Ms. Kucko of firearms straw purchasing.[8] (*Id.* ¶¶ 15.) Specifically, he believed she provided false or misrepresented information when she purchased the Stoeger on July 19, 2021. (*Id.* ¶¶ 16, 25.) At the time of that purchase, Ms. Kucko completed ATF Form 4473, answering "Yes" to question 21.a, which asked, "Are you the actual transferee/buyer of the firearm(s) listed on these forms?" (*Id.* ¶ 16.)

Other facts will be discussed as necessary.

### III.  DISCUSSION

### A.  *Whether Defendants Have Made a Substantial Preliminary Showing They are Entitled to a* Franks *Hearing*

Defendants argue that the affidavit "intentionally included false allegations and omitted material information." (Doc. 27-1 at 1.) Defendants assert that Officer Saunders obtained the warrant based on "uncorroborated allegations of what various people told

---

[8] A straw purchase consists of "[s]omeone's buying of a firearm for another who is prohibited to make such a purchase because of a prior conviction, an order of protection, or some similar judicially imposed proscription." Straw Purchase, *Black's Law Dictionary* (11th ed. 2019).

him about the Defendants," in spite of the fact that "[i]nvestigation has revealed that these allegations are false." (*Id.*) Defendants also assert that Officer Saunders omitted material information from his affidavit in support of the warrant. (*Id.*) Defendants argue they are entitled to a *Franks* hearing based on this preliminary showing.

The Government responds that Defendants "cannot make the substantial preliminary showing required by *Franks*" to be entitled to a hearing. (Doc. 31 at 2.) Accordingly, the Government argues that Defendants' request for a *Franks* hearing and motion to suppress should be denied. (*Id.* at 11.)

> ### 1. Legal Standard

*Franks* held that a defendant is entitled to a hearing when he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." 438 U.S. 154, 155-56 (1978). To receive a *Franks* hearing, a defendant therefore must make a sufficient showing "both (1) that the affiant [ ] knowingly and intentionally made false statements or made them in reckless disregard for the truth and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *United States v. Daigle*, 947 F.3d 1076, 1083 (8th Cir. 2020) (quoting *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013)) (brackets in original).

To make a showing of reckless disregard for the truth, the defendant must show that the affiant "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information" he reported. *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (quoting *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015)). "Recklessness can be inferred from [an] omission 'when the material omitted would have been clearly critical to the finding of probable cause.'" *Id.* (quoting *Conant*, 799 F.3d at 1200). If the defendant fails to make "a 'strong initial

showing' of deliberate falsehood or reckless disregard for the truth," a *Franks* hearing "must be denied." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 743 (8th Cir. 2002)).

If the defendant can make a preliminary showing enough to warrant a *Franks* hearing, the defendant must then establish at that hearing, by a preponderance of the evidence, first "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the search warrant affidavit," and second "that the affidavit's remaining content is insufficient to establish probable cause."[9] *United States v. Butler*, 594 F.3d 955, 960-61 (8th Cir. 2010); *Conant*, 799 F.3d at 1199 (quoting *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). "[N]egligence or innocent mistake is not enough to establish a *Franks* violation." *Freeman*, 625 F.3d at 1050-51 (quoting *Butler*, 594 F.3d at 961). Only if the defendant can meet this burden will the "search warrant . . . be voided [under *Franks*] and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Butler*, 594 F.3d at 961.

### 2. The Affidavit in Support of the Search Warrant

The affidavit provides, in pertinent part, the following:

> I, Joseph C. Saunders, being first duly sworn, on oath, do depose and state as follows:
>
> .   .   .
>
> **Firearms Trafficking Background**
>
> 5. Based on my training, professional education, and experience, I have learned the following about the distribution of firearms and the methods of operation of individuals involved in illegal firearms trafficking:

---

[9] A similar analysis is employed for omissions. "The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Conant*, 799 F.3d at 1200 (quoting *Reinholz*, 245 F.3d at 774).

a. Federal Firearm Licensees (FFLs), which are licensed to deal firearms and are regulated by the ATF, are required to have prospective nonlicensed and non-permitted firearm purchasers complete ATF Form 4473 (Firearms Transaction Record). The FFL also requires photo identification from each purchaser at the time of transfer. The Firearms Transaction Record requires each purchaser to answer basic biographical questions about him/herself as well as questions about prior criminal convictions and/or conduct that may prohibit their possession of firearms. Once that information is communicated to the FFL, the FFL then contacts the Federal Bureau of Investigation (FBI) National Instant Check System (NICS) to see if the prospective buyer is prohibited from purchasing or possessing firearms. If the prospective buyer is not prohibited, the firearm is immediately transferred. If there is a question as to their prohibited status, the transfer can be delayed for up to three business days. If the person is clearly prohibited, the firearm transaction is immediately denied. However, if a person within the State of Iowa possesses a valid Weapons Permit or Permit to Concealed Carry, then the NICS check is not conducted and the firearm is transferred without any verification as to whether the buyer is otherwise prohibited from acquiring firearms.

b. Individuals who are prohibited from possessing firearms or who unsuccessfully attempt to acquire firearms through FFLs very often pursue illegitimate channels to acquire firearms. I know that these individuals will sometimes utilize "straw" purchasers to obtain firearms. These "straw" purchasers assist prohibited persons with circumventing existing regulations that prevent them from acquiring firearms legitimately. Often times, the straw purchasers may themselves be prohibited from possessing or acquiring firearms but are able to circumvent existing laws and/or regulations through a variety of means, to include having a weapons permit, utilizing gun shows, or making misrepresentations on ATF Form 44 73 (Firearms Transaction Record) during the acquisition of firearms.

.   .   .

9

## Probable Cause

6. In August 2021, I identified KUCKO as a suspect in an investigation of firearms trafficking, straw purchasing, and the distribution of firearms to her boyfriend Abyehun TEFERI. In reviewing ATF records, I determined that KUCKO purchased at least one firearm from Fleet & Farm Store, an all-purpose store located at 400 West Ridgeway, in Cedar Falls, Iowa (Fleet & Farm). KUCKO has also purchased at least two firearms from Mr. Guns, a firearms store located at 2415 K Line Drive. Waterloo, Iowa, (Mr. Guns). KUCKO also purchased at least one firearm from Scheels, a sporting goods store, located at 402 Viking Plaza Drive, Cedar Falls, Iowa, (Scheels). Fleet & Farm, Mr. Guns, and Scheels are all FFLs that are licensed to sell firearms. As detailed below, law enforcement officers found out that KUCKO purchased three of these firearms in a short timeframe.

7. On December 17, 2019, KUCKO applied for a new Iowa permit to carry weapons through the Black Hawk County Sheriff's Office, which she obtained on January 3, 2020. In her application, KUCKO listed her address as [XXXX] Ackermant Street, Waterloo, Iowa, and listed [XXX-XXX-XXXX] as her phone number. The notes made in connection with her permit by the Black Hawk County Sheriff's Office state that KUCKO had no local criminal record and no prior firearms permit.

8. On August 9, 2021, Waterloo Police Department Detective Vaska Zubak contacted me about information she received from an employee with Fleet & Farm. On Monday, August 9, 2021, the Waterloo Police Detective Bureau received a phone call from Employee-1, an employee at Fleet & Farm. Employee-1 reported that, on July 2, 2021, a male subject by the name of Abyehun TEFERI along with a female by the name of Alissa KUCKO came into Fleet & Farm to purchase a firearm. TEFERI attempted to purchase a firearm but Fleet & Farm denied the purchase. Fleet & Farm did not proceed with the sale of the firearm to TEFERI due to the results of the NICS background check. The firearm TEFERI tried to purchase was a Stoeger, Model STR-9, 9mm semi-auto pistol, bearing serial number T6429-21W06241.

9. I reviewed the documents from TEFERI's attempted purchase. He filled out the ATF Form 4473 on July 1, 2021. In reviewing video from Fleet

& Farm, I saw that on July 2, 2021, TEFERI and KUCKO entered the store and approached the firearms counter. The in-store video surveillance appears to show that the sales associate informed TEFERI and KUCKO that, due to the results of the NICS background check, Fleet & Farm could not sell him the firearm he wanted to purchase, which was the Stoeger, Model STR-9, 9mm semi-auto pistol, bearing serial number T6429-21W06241. KUCKO was standing next to TEFERI when the sales associate informed TEFERI he could not purchase the firearm. The sale[s] associate handed TEFERI some paperwork, and TEFERI and KUCKO walked out of the store.

10. Employee-1 additionally reported that, on July 19, 2021, KUCKO purchased a handgun from Fleet & Farm. KUCKO knew what firearm she wanted without any assistance and without handling any of the store's firearms. KUCKO purchased a Stoeger, Model STR-9, 9mm semi-auto pistol, bearing serial number T6429-21T00104.

11. Employee-1 further stated that, on July 27, 2021, both KUCKO and TEFERI came into Fleet & Farm together. Employee-1 observed that TEFERI had the firearm that KUCKO had purchased in his possession. Employee-1 reported TEFERI referred to the firearm as "my gun" and visibly showed the firearm to the sales associate. TEFERI said he was looking for a holster to fit his firearm. The sales associate helped TEFERI select a holster and gave TEFERI one of their display Stoeger firearms from the display case to see how it fit in the holster.

12. Employee-2 was the Fleet & Farm sales associate who assisted TEFERI on July 27, 2021. Employee-2 stated that on July 27, 2021, at about 1:50 p.m., a male individual (TEFERI) walked up to the gun counter and asked if the store had a holster for "his gun." Employee-2 asked what type of firearm TEFERI had, and TEFERI showed Employee-2 his gun in his waistband. Employee-2 carries the same brand of firearm and recognized the firearm as a Stoeger immediately. Employee-2 then realized who TEFERI was and noticed that the female subject with TEFERI, KUCKO, was the same person that bought the firearm TEFERI was carrying.

13. After recognizing TEFERI, Employee-2 asked TEFERI questions, including whether TEFERI had shot the firearm and whether he had

taken it apart yet. TEFERI said he loved it and that it shot great. TEFERI stated multiple times that it was his firearm. TEFERI tried the holster on himself and said, "Yeah, this fits good on me," indicating he would be the one wearing the holster. TEFERI then purchased 9mm ammunition while KUCKO was purchasing .22 caliber ammunition.

14. Employee-3, another Fleet & Farm sales associate, reported that, on August 7, 2021, at approximately 1:40 p.m., he was approached by KUCKO and restocking Fleet & Farm's ammunition aisle. KUCKO and TEFERI's request caught Employee-3 off guard because he knew that KUCKO had purchased a 9mm Stoeger, Model STR-9 9mm pistol. The ATF Form 4473 from KUCKO's July 19, 2021 purchase of the 9mm Stoeger shows that Employee-3 was the store employee who sold her that firearm. During the August 7, 2021 visit, TEFERI asked Employee-3 about 9mm hollow points for "his gun." Employee-3 pointed out to TEFERI that Fleet & Farm had hollow point as well as Full Metal Jacket (FMJ) target rounds for 9mm. TEFERI proceeded to purchase 2 boxes of FMJ ammunition and a single box of hollow point ammunition for "his 9mm."

.   .   .

16. During the July 19, 2021 purchase at Fleet & Farm Store, I believe KUCKO provided false or misrepresented information when she filled out an ATF Form 4473. On the ATF Form 4473 KUCKO filled out in connection with her firearm purchase, KUCKO answered, "Yes" to question 21.a, which asked, "Are you the actual transferee/buyer of the firearm(s) listed on these forms?" That question is accompanied by a warning instructing any purchaser that "You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you." KUCKO signed the ATF 4473 form, certifying that her answers on the ATF 4473 forms were true, correct, and complete.

17. On August 9, 2021, I examined TEFERI's criminal history. I saw that on June 22, 2021, TEFERI pled guilty to Assault Causing Bodily Injury and received a deferred judgment with a probation period of one year. The victim of the assault was KUCKO. The assault occurred at 114 7 Ackermant Street. On the date of the assault, March 10, 2020, KUCKO

told a Waterloo police officer that she and TEFERI had been together for four years. TEFERI said KUCKO was his girlfriend and that they had been living together for the last two years.

.   .   .

19. The ATF Form 4473s that KUCKO filled out at Mr. Guns showed that she purchased a Canik/Century Arms (31493), Model TP9SFX, 9mm semi-auto pistol, bearing serial number 20BC29871, on July 6, 2021, and a German Sport Guns (59992), Model GSG-16, .22LR caliber Rifle, bearing serial number A891835, on July 24, 2021.

20. I asked the Mr. Guns store owner if KUCKO ever had anyone with her when she was purchasing firearms. He reported that there was always a tall, thin, light-skinned black male with KUCKO. I noted that this description of the male subject with KUCKO matches the general characteristics of TEFERI.

21. I then went to Scheels to pick up an ATF Form 4473 KUCKO had signed when she previously bought a firearm from Scheels. The ATF Form 4473 showed that KUCKO purchased a Ruger, Model Security 9, 9mm semi-auto pistol, bearing serial number 382-67501, on February 26, 2020.

22. In reviewing the reports of the March 10, 2020 assault that TEFERI committed against KUCKO, I noted that when Waterloo police officers responded to the report of the assault and met with KUCKO, an officer saw a Ruger handgun box in the bedroom where KUCKO was found. An officer asked KUCKO if there was a handgun in the box. She said there was, and an officer seized the handgun for safekeeping. An officer asked KUCKO if there were any other weapons in the residence. She said that TEFERI had a handgun of his own. The officer spoke with TEFERI who directed the officer to a Taurus handgun in a dresser drawer. The officer seized the Taurus handgun as well. KUCKO and TEFERI subsequently filed separate applications for the return of seized property in the Iowa District Court for Black Hawk County. The court granted KUCKO's application for the return of the Ruger firearm on August 13, 2020, and TEFERI's application for the return of the Taurus firearm on July 22, 2021.

(Def. Ex. A at 1; ¶¶ 5(a)-(b), 6-14, 16-17, 19-22.)

### 3. Whether Defendants have Made a Substantial Preliminary Showing the Affidavit Contains False or Misleading Statements, Omissions, or a Misrepresented Timeline

Defendants argue that the affidavit contains false and misleading information, omissions, and misrepresentations and obscure timelines. (Doc. 27-1 at 4-7.) I will address each of Defendants' arguments in turn.

### a. Defendants have not made a substantial preliminary showing of allegedly false and misleading statements.

#### i. Paragraph 9

Defendants argue that Officer Saunders's statement that "in-store video surveillance *appears* to show that the sales associate informed Teferi and Kucko that, due to the NICS background check, Fleet & Farm could not sell him the firearm he wanted to purchase." (*Id.* at 4 (emphasis in original) (citing Def. Ex. A ¶ 9).) Defendants argue that Fleet Farm surveillance video does not have audio so there is no way to know what employees said to Defendants. Moreover, since Officer Saunders does not attribute this statement to a specific employee, Defendants find this statement suspect. For support, Defendants cite Defense Exhibit B. (*Id.*)

Paragraph 9 states that Mr. Teferi attempted to purchase a firearm from Fleet Farm on July 2, 2021 and was denied due to his NCIS background check. To gather this information, Officer Saunders reviewed documents associated with the attempted purchase. In Paragraph 9, Officer Saunders also refers to reviewing in-store surveillance video from that date, not from July 27, 2021, which is the date of the in-store surveillance video in Defense Exhibit B, the date Defendants purchased the holster. Defendants do not challenge the substantive facts presented by Officer Saunders: Mr. Teferi was not allowed to purchase a Stoeger Model STR-9, 9mm semi-auto pistol on July 2, 2021 because he failed a background check and Ms. Kucko was with him when he was denied the opportunity to purchase the firearm. The video is consistent with these facts even

14

without audio. Officer Saunders never represented that he could hear the video during this exchange. There is no evidence that Officer Saunders "entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information" he reported in paragraph 9. *Reed*, 921 F.3d at 756.

Moreover, if the un-attributed employee notification to Defendants is redacted from Paragraph 9, the substance of the paragraph is not changed. For a defendant to establish a *Franks* violation, he must not only show both that a deliberately or recklessly false statement was included in the affidavit, but also that if such a false statement were stricken from the affidavit, "the affidavit's remaining content [would be] insufficient to support probable cause." *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001).

If the information is redacted, Paragraph 9 still states that Mr. Teferi completed an ATF Form 4473 on July 1, 2021; that he tried to purchase a Stoeger Model STR-9, 9mm semi-automatic pistol at Fleet Farm on July 2, 2021 while accompanied by Ms. Kucko; that he was denied the opportunity to purchase the firearm due to the NICS background check; that he was given paperwork by a Fleet Farm employee; that Ms. Kucko stood next to him during his interactions with the Fleet Farm employee; and that Defendants left Fleet Farm without purchasing the Stoeger. This is the important substantive information in the paragraph. Mr. Teferi does not claim ignorance of his prohibited status or that he did not know he was denied the opportunity to purchase the Stoeger based on a background check. Paragraph 9 supports probable cause even with the offending information redacted.

### ii. Paragraphs 10 and 14

Defendants assert that there is an inconsistency between Officer Saunders's statement in Paragraph 10 that "Employee-1 . . . reported that, on July 19, 2021, KUCKO purchased a handgun from Fleet & Farm. KUCKO knew what firearm she wanted without any assistance and without handling any of the store's firearms[]" and his statement in

Paragraph 14 that "Employee-3 was the store employee who sold [KUCKO] that firearm" on July 19, 2021. (Doc. 27-1 at 4.) To the extent Defendants assert these paragraphs contain misstatements of material fact, I disagree. Both these statements can be and, from all evidence before the Court, appear to be true. As is shown on Defense Exhibit B, even though one employee handles a sale, other employees can be nearby and even engage with customers during the sales process. (Def. Ex. B at 5:58-6:37.) Therefore, it would not be unusual for an employee not credited with a sale to remember a customer. The statements do not say that ATF records show that two different employees were listed as the employees who sold the firearm. Only Employee-3 is so listed and only Employee-3 claimed to be the one who sold the firearm. (Def. Ex. A ¶ 14.) This argument is without merit.

Because Defendants do not assert a misstatement of material fact but only allege a nonexistent inconsistency, proceeding to step two of the analysis is unnecessary.

### iii. *Paragraphs 11 and 12*

Defendants argue that there was no basis in fact for Officer Saunders to assert that Mr. Teferi had the Stoeger firearm Ms. Kucko purchased on July 19 with him when Defendants entered Fleet Farm on July 27, 2021. (Doc. 27-1 at 5.) Specifically, Defendants assert that Officer Saunders's statements that Mr. Teferi referred to the firearm Defendants were purchasing a holster for as "his gun" and that he "showed Employee-2 his gun in his waistband" are unsupported by in-store surveillance video. (*Id.*; Doc. 35 at 2.)

Defendants note that on July 22, 2021, the District Court for Black Hawk County granted Mr. Teferi's application for the return of his Taurus firearm. (Doc. 27-1 at 5 (citing Def. Ex. A ¶ 22).) Therefore, according to Defendants, it is logical that Mr. Teferi was purchasing a holster for the Taurus, which would be the gun he was referring to when he said, "his gun." (*Id.*) Defendants also argue that in Paragraph 11 of the

affidavit, Officer Saunders admits that the sales associate gave Defendants "one of their display Stoeger firearms from the display case to see how it fit in the holster." (*Id.* (citing Def. Ex. A ¶ 11).) Defendants argue that if Mr. Teferi had a firearm with him, there would have been no need for him to use a display firearm because it would have made more sense for him to try the fit of the holster using his own gun.[10] (*Id.*)

This argument is the heart of the disagreement between the parties and the reason I heard oral argument on the *Franks* issue.

In Defense Exhibit C, Fleet Farm Loss Prevention Incident Report, Employee-2 stated that "[o]n July 27th . . . a gentleman walked up to the gun counter and asked if we had a holster for 'His' gun. I asked what type of firearm he had and he showed me his gun in his waistband."

It is easy to dispense with Defendants' argument that it was logical they were at Fleet Farm to purchase a holster for a Taurus firearm. While Mr. Teferi asserts that it would not make sense to use the store display Stoeger firearm to assess the fit of the holster if he, indeed, had brought his own gun into the store, he does not argue that the store display Stoeger firearm was the wrong firearm to evaluate the fit of the holster or that he did not check the fit of the holster using the store's display Stoeger. Although the view is obstructed, Defense Exhibit B shows Mr. Teferi using the display firearm when trying on the holster and assessing the fit of the gun in the holster. (Def. Ex. B at 5:31-5:50.) Defendants do not dispute that Mr. Teferi used the display Stoeger for this purpose. One thing the video does clearly show is Mr. Teferi taking the display firearm

---

[10] Defendants also state, without citation to authority, that it is Fleet Farm policy "that anyone with a firearm on their person has to check in with Customer Service prior to shopping." (Doc. 27-1 at 5.) This is merely a statement that never ripens into an argument. Defendants do not contend that they would have followed the policy and checked the firearm if they had it with them. I also cannot assume that all customers follow store policy.

from Employee-2 and using it for fitting purposes. (*Id.* at 5:28-5:50.) It is Fleet Farm's rule to use display guns for this purpose to assure employee safety. (Def. Ex. C.)

Defendants' primary argument is that, contrary to what Officer Saunders stated in Paragraphs 11 and 12 of the affidavit, Exhibit B does not show Mr. Teferi "visibly showing a firearm or displaying his waistband to any store employee." (Doc. 27-1 at 5.) At oral argument, Defendants expanded this argument by stating that Exhibit B briefly shows Mr. Teferi from the front several times. My review of Exhibit B shows that Mr. Teferi is wearing very casual trousers (perhaps "sweatpants"); a loose-fitting, although not baggy, white T-shirt that is not tucked into his pants; and an open dark gray jacket. No bulges are obvious under his T-shirt or in the waistband of his pants.

Defendants are correct. I have watched Exhibit B multiple times at full speed and at two different reduced speeds and have been unable to find a gesture or action that shows Mr. Teferi lifting his T-shirt or making some other movement that definitively shows him displaying a gun to an employee.

Defendants enter the video from the left, walk straight to the gun counter, where they encounter Employee-2 and talk for a few seconds. (Def. Ex. B at 00:00-00:17.) During this time, Mr. Teferi is in profile and his jacket blocks the view of his T-shirt. When he is at the counter, he leans forward with his hands on the counter, so he certainly did not pull up his shirt or pull back his jacket at this time. Mr. Teferi and Employee-2 then proceed back to the left to an aisle to look at merchandise. As Mr. Teferi is turning to follow Employee-2, he has his back to the screen. (*Id.* at 00:19-20.) During most of the time Mr. Teferi is in the aisle with Employee-2, either Mr. Teferi's hands are not visible because of the way he is standing, his jacket is obstructing the view of his side, or his back is to the camera. (*Id.* at 00:31-4:22.) When Employee-3 and Defendants walk back to the gun counter apparently to try a holster with a firearm, they walk to the side of the counter that has an obstructed view. During their walk to the counter, the

video picks up a front view of Mr. Teferi, but it is impossible to tell if he is hiding a gun in his waistband under his T-shirt. (*Id.* at 4:23-30.) During the rest of the video, the brief glimpses I see of Mr. Teferi's hands give me no indication that he is showing anyone anything in his waistband, which makes sense because, as I stated at the hearing, it seems that Mr. Teferi would have shown the firearm, if at all, by the time Employee-2 took the display firearm and holster out of the case. (*Id.* at 5:11-29.)

However, as noted above, there are several times when Mr. Teferi is facing away from the camera or when he is in profile when he could have shown Employee-2 a firearm in his waistband as Employee-2 stated. As Government Counsel argued at the hearing, this action could have taken as little as a second. Based on my review of the evidence, at worst Officer Saunders may have neglected to state that the Fleet Farm surveillance video does not clearly show Mr. Teferi showing Employee-2 a firearm. As "*Franks* does not apply to negligent misrepresentations," Officer Saunders's failure to include this additional information is not grounds for a *Franks* violation even if it amounts to negligence[11]. *Conant*, 799 F.3d at 1201 (quoting *United States v. Coleman*, 349 F.3d 1077, 1085 (8th Cir. 2003)); *United States v. Neal*, 528 F.3d 1069, 1073 (8th Cir. 2008) (omission was, at most, immaterial discrepancy that did not constitute a *Franks* violation).

Employee-2 stated that Mr. Teferi showed him a Stoeger firearm. (Def. Ex. C.) That is the information Officer Saunders included in the affidavit. (Def. Ex. A ¶ 12.) Officer Saunders did not attest that *Officer Saunders* saw Mr. Teferi show a firearm. He merely relayed information from Employee-2 who had proven himself diligent and

---

[11] I doubt that the omission of this ambiguous information even constitutes negligence. Had the video been clearer in casting doubt on Employee-2's statement, the omission might have helped establish a substantial preliminary showing for a *Franks* hearing. Under the circumstances (and in light of the other facts contributing to probable cause), failing to alert the judge to an ambiguous absence of evidence that might or might not corroborate a witness's statement does not impress me as a negligent omission. At some point, the author of an affidavit must exercise some editorial control.

observant by recognizing Defendants, identifying Mr. Teferi as someone prohibited from purchasing firearms and engaging him in conversation to confirm his suspicions, and identifying Ms. Kucko as the purchaser of the Stoeger firearm at issue. (Def. Ex. C.) Contrary to Defendants' argument that Employee-2's allegations are uncorroborated (Doc. 27-1 at 6), information regarding Mr. Teferi's attempted purchase of the Stoeger firearm on July 2, 2021 and Ms. Kucko's purchase of the Stoeger firearm on July 19, 2021 was corroborated by Employee-1, Employee-3, and Officer Saunders's own review of relevant evidence. (Def. Ex. A ¶¶ 7-10, 14.)[12]

---

[12] As shown here, corroboration only strengthened the probable cause in the four corners of the warrant. Moreover, a disinterested employee's recitation of events did not require corroboration. The cases cited by Defendants requiring corroboration deal with confidential informants, which is not the situation in this case. (Doc. 27-1 at 7 (citing *United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009); *United States v. Glover*, 755 F.3d 811, 815-16 (7th Cir. 2014)).

> "The lower courts have rather consistently held that the proof-of-veracity rules which obtain in informant cases are not applicable with respect to other sources of information." 2 LaFave, *supra*, § 3.4(a), at p. 220. "'[A] citizen informant is inherently more reliable than the usual police informants who are often mired in some criminal activity themselves.'" *Edwards v. Cabrera*, 58 F.3d 290, 294 (7th Cir. 1995) (internal citation omitted). Thus, where an affiant recites information obtained from "a private citizen and a victim," the usual degree of corroboration is not required. *United States v. Lewis*, 738 F.2d 916, 922 (8th Cir. 1984) (rejecting challenge to source's credibility and reliability). *Accord United States v. Ross*, 713 F.2d 389, 393 (8th Cir. 1983) ("We here deal with a citizen informant with no motive to falsify, rather than a professional informant, with attendant credibility concerns."); *see also* . . . *United States v. Sparks*, 265 F.3d 825, 830 (9th Cir. 2001) ("This was not an unreliable criminal informant, but a complaining victim who had no apparent reason to lie."); *United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001) (stating that "[a]n ordinary citizen's eyewitness account . . . is normally sufficient to supply probable cause" without further corroboration).

*United States v. Kahmann*, No. CIV. 06-373 JRT/SRN, 2007 WL 909733, at *5 (D. Minn. Mar. 23, 2007). If anything, employees of Fleet Farm had a heightened motivation to get the facts right because they were reporting as part of their job responsibilities and to comply with federal gun laws

Importantly, even if references to "my gun" and to Mr. Teferi showing Employee-2 a gun are redacted from Paragraphs 11 and 12, the paragraphs still support probable cause. The redacted paragraphs would read as follows:

11. Employee-1 further stated that, on July 27, 2021, both KUCKO and TEFERI came into Fleet & Farm together. . . . TEFERI said he was looking for a holster to fit [a] firearm. The sales associate helped TEFERI select a holster and gave TEFERI one of their display Stoeger firearms from the display case to see how it fit in the holster.

12. Employee-2 was the Fleet & Farm sales associate who assisted TEFERI on July 27, 2021. Employee-2 stated that on July 27, 2021, at about 1:50 p.m., a male individual (TEFERI) walked up to the gun counter and asked if the store had a holster for "[a] gun." Employee-2 asked what type of firearm TEFERI had. . . . Employee-2 carries the same brand of firearm. . . . Employee-2 then realized who TEFERI was and noticed that the female subject with TEFERI, KUCKO, was the same person that bought [a handgun].

This redacted version of Paragraphs 11 and 12 would still allow a judge to conclude that Mr. Teferi was purchasing the holster for the Stoeger Ms. Kucko purchased on July 19. Not only is probable cause based on the totality of the circumstances, but judges also "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (citations omitted). Here, it would be reasonable for a judge to infer that Mr. Teferi was claiming actual use and/or ownership of the Stoeger for the following reasons:

(1) Mr. Teferi and Ms. Kucko are in a relationship and live together (Def. Ex. A ¶¶ 17, 24);

(2) On July 2, 2021, Mr. Teferi wanted to purchase the Stoeger, was unable to do so, Ms. Kucko was with him when he was denied that opportunity, and therefore knew he could not purchase the firearm on his own (*Id.* ¶ 9);

21

(3) Ms. Kucko purchased the same model Stoeger on July 19, 2021; that is, only 17 days later (*Id.* ¶ 10);

(4) On July 27, 2021, eight days after Ms. Kucko's purchase of the Stoeger, *Mr. Teferi* asked Employee-2 for help selecting a holster and used the store display Stoeger to assess the holster's fit (¶¶ 11-12);

(5) Mr. Teferi said the holster "'fit[] good on [him],' indicating he would be the one wearing the holster"(*Id.* ¶ 13); and

(6) Mr. Teferi also said he loved the gun, and that "it shot great," when discussing the Stoeger, which also indicates that he was the person that had used and would be using the gun. (*Id.*)

Even if redacted Paragraphs 11 and 12 do not support the inference that Mr. Teferi brought a firearm into Fleet Farm with him on July 27, they support the reasonable inference that Mr. Teferi shot the Stoeger and intended to wear the holster and to carry the Stoeger in the holster. Along with the rest of the totality of the information in the affidavit, Paragraphs 11 and 12 also still support probable cause that Ms. Kucko provided a false statement when she purchased the Stoeger on July 19, 2021.[13] (*Id.* ¶ 25.)

### iv. *Allegedly Misrepresented Timeline*

Defendants assert that the "timing of events is misrepresented and obscured in the affidavit." (Doc. 27-1 at 7.) Specifically, Defendants take issue that the acknowledgment that the Iowa District Court for Black Hawk County returned Mr. Teferi's Taurus to him on July 22, 2021 appears in Paragraph 22 when the return happened less than a week

---

[13] Although Ms. Kucko is charged with Possession of a Firearm by an Unlawful User of a Controlled Substance in addition to False Statement During Purchase of a Firearm and Mr. Teferi is charged only with Possession of a Firearm by an Unlawful User of a Controlled Substance (Doc. 3), the search warrant application need only contain probable cause to believe the warrant would lead to evidence that Ms. Kucko had made a false statement in conjunction with her purchase of a firearm. (Def. Ex. A ¶ 25.)

prior to Mr. Teferi going to Fleet Farm to purchase ammunition and a holster on July 27, 2021. (*Id.*) The July 27 purchases are discussed in Paragraphs 11 and 12. (*Id.*)

Defendants do not explain the significance of this alleged misrepresentation or attempt to obscure the timeline and I find that the cited paragraphs, even read in tandem, do not constitute a misrepresentation or an attempt to obscure the facts. As the Government states, "Defendants' apparent disagreement with this ordering does not show any false statement or misrepresentation regarding facts critical to probable cause." (Doc. 31 at 11.)

When deciding if probable cause exists to issue a warrant, judges must consider the totality of the circumstances contained in the warrant: they "do not evaluate each piece of information independently; rather, [they] consider all of the facts for their cumulative meaning." *United States v. Tyler*, 238 F.3d 1036, 1038 (8th Cir. 2001) (citing *United States v. Morales*, 923 F.2d 621, 623-24 (8th Cir. 1991)). Moreover, warrants must be read in a common-sense manner, which in this instance, means putting information in chronological order. *See United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quotation omitted). Because there is no evidence supporting an attempt to obscure or mislead and the timing of events is clear, this argument is without merit.[14] Furthermore, if the timeline is rearranged as Defendants seem to request, there is no effect on probable cause because no information in the affidavit is changed.

> **b.** ***Defendants have not made a substantial preliminary showing of reckless omissions.***

To make a sufficient preliminary showing to entitle them to a *Franks* hearing based on omissions, Defendants must show "(1) that facts were omitted with the intent to make,

---

[14] The affidavit discusses the events related to Defendants' purchase of the Stoeger and the holster before it discusses Officer Saunders's investigation. Therefore, it was logical for Officer Saunders to discuss his impressions of a previous assault after he discussed facts relevant to the instant warrant application.

or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Conant*, 799 F.3d at 1200 (quoting *Reinholz*, 245 F.3d at 774).

Defendants argue that Officer Saunders failed to include two facts in his affidavit: (1) that Ms. Kucko tried on the holster and (2) that Defendants resided together as boyfriend and girlfriend. (Doc. 27-1 at 5, 7.)

My review of Defense Exhibit B does not show that Ms. Kucko tried on the holster. Even with the obstructed view, it is clear there was not time for her to try it on when both Defendants' focus was on how the holster fit the firearm and fit Mr. Teferi. (Def. Ex. B at 5:17-6:32.) At most, Ms. Kucko may have held the holster up to her side or hip, but that action is blocked by the fishing rod display. (*Id.* at 5:37-5:55.) Moreover, even if Ms. Kucko did try on the holster, that does not negate evidence that Mr. Teferi stated he was looking for a holster for "his gun," that the gun he referred to was a Stoeger,[15] and that Mr. Teferi practiced fitting a display Stoeger into the holster. (Def. Ex. A ¶¶ 11-13.) It also does not negate Defendants' own evidence, Employee-2's Loss Incident Report, which states Mr. Teferi "tried the holster on himself and said[,] 'Yeah, this fits good on me[,]' indicating he will be the one wearing it." (Def. Ex. C.)

Defendants' assertion that the affidavit does not state they lived together as boyfriend and girlfriend is simply without merit, as Defendants conceded at the hearing. Defendants' address is listed in three places in the affidavit. Ms. Kucko's address is listed in Paragraph 7 detailing her application for an Iowa permit to carry weapons. Paragraph 17 relays information related to the March 10, 2020 police call at [XXXX] Ackermant Street. Ms. Kucko told officers at that time that she and Mr. Teferi had been together four years and Mr. Teferi said they had been living together two years and that

---

[15] Or, in the alternative, that Mr. Teferi was the obvious customer in the transaction and was buying a holster for a handgun he would use.

Ms. Kucko was his girlfriend. Paragraph 24 states that both Defendants listed [XXXX] Ackermant Street as their legal residence. These statements document that Defendants live together.

Furthermore, if this "omitted" information was added to the affidavit, or stated in more places, as the case may be, it only bolsters probable cause because it could lead a reasonable judge to conclude that Ms. Kucko had strong motivation to lie on the ATF Form 4473 she completed when she purchased the Stoeger on July 19. Accordingly, none of the allegedly omitted information was "clearly critical to a finding of probable cause." *Reed*, 921 F.3d at 756.

**B.    *Conclusion***

For all the reasons discussed above, Defendants have failed to meet their burden that they are entitled to a *Franks* hearing based on any alleged misstatements, misrepresentations, or omissions. Moreover, even if the statements Defendants claim should be stricken from the affidavit are stricken or statements Defendants claim were recklessly omitted are added to the affidavit, the affidavit still supports probable cause.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendants' Joint Motion to Suppress. **(Doc. 27.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to

appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 15th day of November, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa